**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.:**

PLASMATICA, LTD. and ROSTAN MEDICAL, INC.,

Plaintiffs,

v.

MEDTRONIC, INC.,

Defendant.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Plasmatica, Ltd. ("Plasmatica, Ltd.") and Rostan Medical, Inc. ("Rostan") (collectively, "Plasmatica" or "Plaintiffs") complain of Defendant Medtronic, Inc. ("Medtronic") and allege as follows:

## NATURE OF THE ACTION

1. This case concerns Medtronic's foreclosure of competition in the U.S. market for laparoscopic anti-fog devices, which are important equipment that keeps a surgeon's view clear during minimally invasive surgery. Medtronic, the world's largest medical-device company, sells the dominant laparoscopic anti-fog device, the Clearify Visualization System, and controls approximately 80% of the market. Medtronic maintains that share not by competing on the merits. Instead, it does so by blocking product trials and using bundled, market-share-based agreements that require hospitals to purchase Clearify together with Medtronic's other surgical products. Failure to comply results in penalty pricing across Medtronic's entire surgical portfolio that makes it impossible for rivals to compete. Those agreements last for years and operate as de facto

exclusive dealing that shuts out rivals like Plasmatica, an innovator offering a better, lower-priced, breakthrough-technology product.

2. In laparoscopic surgery, the surgeon operates through small incisions and sees the surgical field only through the image the laparoscope transmits to a video monitor. The laparoscope lens is, in effect, the surgeon's eye inside the patient. That vision is obscured by fog in the warm, humid body cavity, or soil from surgical smoke, blood, and tissue debris. When that happens, the surgeon must stop the operation, withdraw the scope, clean and defog it, and reinsert it. This often happens many times in a single procedure, and often at precisely the moments when clear vision matters most. Every interruption prolongs surgery and anesthesia, adds cost, and creates risk for the patient. Laparoscopic anti-fog devices are dedicated equipment that prevents, reduces, or eliminates lens fogging and reduces soiling so that surgeons can maintain a continuously clear view and minimize interruptions to the procedure.

3. Plasmatica solved this problem at its source. The PLASMAShield® system ("PLASMAShield") applies a brief, 10-second pre-operative cold-plasma treatment that renders the lens surface super-hydrophilic. As a result, liquid that touches the lens spreads into a thin transparent film on the lens, which creates a liquid "shield" that prevents fog from obstructing visibility before it forms and allows the scope to stay inside the patient. Plasmatica developed PLASMAShield over a ten-year period and dedicated over 50 person-years of time and invested tens of millions of dollars into its development. Plasmatica's R&D pipeline included base units, disposables, a fluid application process, trocar cleaners, seals, drapes, etc.

4. PLASMAShield also has significant environmental advantages compared to Clearify. Clearify employs a minimum of three (3) AA batteries per procedure, generating an estimated 8 million disposable AA batteries each year and an estimated 200 tons of hospital waste

every year in the U.S. alone. In contrast, PLASMAShield does not use any disposable batteries and thus avoids such waste. A Life Cycle Assessment study comparing PLASMAShield to Clearify also shows that Clearify produces significantly more carbon emissions than PLASMAShield. According to the study, the Clearify Visualization System generates over thirty-five times more carbon emissions per unit than the PLASMAShield disposable components (61.06 kg $CO_2$e vs. 1.67 kg $CO_2$e).

5. PLASMAShield outperforms Clearify. Surgeons who have used PLASMAShield report: "Truly the best picture I have ever seen," and "[t]hat was the first resection I've ever done with a 5mm scope without having to remove the scope once to clean it." As explained in more detail below, cases conducted using PLASMAShield had essentially zero required removals of the laparoscope due to fogging, including for complicated surgeries approaching ten hours in length. In contrast, Clearify typically requires that the surgeon remove the laparoscope and re-treat it several times per surgery. In fact, the Clearify unit itself only lasts up to five hours, so complicated surgeries require two or sometimes even three Clearify units. In addition to the monetary burden on the hospital, each of those Clearify units uses additional disposable batteries at significant costs to the environment and increasing hospital waste processing.

6. Despite PLASMAShield's clinical, economic, and environmental advantages, Plasmatica has been unable to meaningfully penetrate the relevant market. The lack of market penetration is not due to Plasmatica having a less effective product or a commercial inability to reach key decision makers in the sales process, but because Medtronic prevents hospitals and surgeons from deciding on the merits of laparoscopic anti-fog devices. Hospitals repeatedly explain that they cannot adopt or even evaluate PLASMAShield because doing so would jeopardize pricing on unrelated Medtronic products. Nor is the lack of market penetration due to

Plasmatica's prices. Plasmatica has repeatedly cut its prices and undercut Medtronic's pricing to try to make sales, but doing so has not enabled Plasmatica to penetrate the market. As explained below, Medtronic's pricing penalties on other products are so severe that hospitals cannot purchase PLASMAShield at any price.

7. Medtronic's use of such strategies to eliminate competition is well documented. Medtronic's now-public documents describe a strategy, applied across Medtronic's surgical-device portfolio, of bundling multiple product categories into a single agreement in order to dominate the products Medtronic sells.[1] Medtronic acknowledges that it holds a "monopoly" on "portfolio breadth." Medtronic alone sells the full range of operating-room products that hospitals buy, including monopolar devices (approximately 60% Medtronic share) and advanced bipolar devices (over 70% share). Medtronic has even likened its bundle to the "ultimate gorilla." Medtronic uses that unmatched portfolio to condition a hospital's pricing across many products on the hospital's commitment to buy 80% to 90% or more of each product, including laparoscopic anti-fog devices, from Medtronic. Medtronic executes the strategy through three related and mutually reinforcing tactics.

8. First, Medtronic stops hospitals from even trying a rival's product. Laparoscopic anti-fog devices require product trials for a hospital to convert. Few if any hospitals convert without product demonstrations, hands-on evaluation, and clinical trials. Medtronic's now-public documents instruct its sales force that if "accounts begin competitive trials," Medtronic should

---

[1] All allegations in this Complaint are based on public information or information from Plasmatica. Unless otherwise noted, references in this Complaint to Medtronic documents and testimony are based on public information from the closing slides of Applied Medical Resources Corp., JMOL briefing, and/or the trial transcripts, filed publicly on the docket in *Applied Medical Resources Corp. v. Medtronic, Inc.*, Case 8:23-cv-00268-WLH-DFM, Dkt. Nos. 331, 336, 377, 379, 381, 383, 385, 387, 389, 391, 393-3, 393-4, 413 (C.D. Cal.). All emphasis in quotations is added unless otherwise noted.

"communicate violation of our pricing agreements and be prepared to take them to access/list tier," the punitive default pricing of Medtronic's group purchasing organization ("GPO") agreements. Other now-public documents show that Medtronic works to "eliminate the competition from getting a window that would allow for a trial" of rival products. As a result of Medtronic's strategy to stop product trials, Plasmatica has been able to secure only a limited number of product trials. Many more hospitals have declined even to trial PLASMAShield because of Medtronic. And, as explained below, even where a trial occurs and succeeds, Medtronic's bundling prevents the hospital from converting.

9. Second, when a rival conducts a successful trial and offers an equal or lower price, Medtronic's exclusionary bundling makes the sale impossible to close. Because moving even one product to a rival will cost a hospital its so-called "discounts" across Medtronic's entire portfolio, the effective price a rival must offer is below its costs. Medtronic's own public documents boast that its portfolio leverage made it "impossible" for a rival "to close the deal."

10. Third, Medtronic's long-term, staggered agreements impose strict market-share requirements, policed with compliance forms, audits, and punitive repricing, that make the agreements de facto exclusive. Medtronic's now-public documents concerning its surgical-product agreements show that it instructs employees to raise prices if a customer "slip[s] $1 below the 85% commitment." When asked whether Medtronic has "the ability [to] punitively raise their pricing" for customers who were not compliant, the answer was: "Yes, you do." Medtronic's personnel described raising prices as the "nuclear option." Medtronic touts the "strength of [its] long-term contracts" and its personnel discussed "widen[ing] the moat around [its] business." On a public earnings call, Medtronic's chief executive officer assured investors that its contracts are so "tight" that, even when Medtronic cannot supply product and "a competitor takes up that"

business, Medtronic ends up "right back to where we were based on the contract." Because hospitals cannot trial or convert during a contract term, they renew without ever running a competitive process. That turns every exclusion into a multi-year, portfolio-wide exclusion that rolls forward year after year.

11. Medtronic calls the price differentials that enforce this scheme "rebates" or "discounts." In reality, Medtronic raises its non-bundled product prices so that the penalty it can threaten grows ever larger. The "discounts" are thus not better prices but manufactured price differentials that amount to penalties for buying from a rival. Medtronic's public documents describe the bundle as "an attractive way to defend our business and/or hide a price increase," with increases folded into the "wrap" in the "hope not to be noticed" by customers.

12. Hospitals do not ask for these arrangements. One health system told Medtronic that "[b]undling of product lines in an attempt to force conversion on one product line" is "[u]nacceptable" and accused Medtronic of "hold[ing] tier level approvals hostage." Yet hospitals comply because they cannot afford not to comply. Hospital after hospital has turned Plasmatica away for reasons that have nothing to do with PLASMAShield's performance, availability, or head-to-head pricing. For example, one explained it "cannot use [PLASMAShield] across the system as it will change our rebate." Another hospital was "100% Medtronic so no room to get [PLASMAShield] in."

13. The results are precisely what the antitrust laws exist to prevent: supracompetitive prices, fewer choices, and suppressed innovation. Blocking competition is the point of Medtronic's scheme. High barriers to entry, and Medtronic's practice of targeting any account where a rival gains traction, ensure that the foreclosure endures. None of this conduct has any legitimate business justification that could not be achieved through less restrictive means.

14. Plasmatica therefore brings this action under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Plasmatica seeks to recover treble damages and to obtain permanent injunctive relief that unlocks the market for innovative laparoscopic anti-fog devices so that hospitals and surgeons can choose their surgical instruments on the merits.

**PARTIES**

15. Plasmatica, Ltd. is a medical-device company organized under the laws of Israel with its principal place of business in Israel. Plasmatica, Ltd. develops, manufactures, and sells a laparoscopic anti-fog device, the PLASMAShield system. Plasmatica, Ltd.'s products are sold in interstate commerce in an attempt to compete against Medtronic's laparoscopic anti-fog products in the United States. Plasmatica, Ltd. devotes a substantial share of its resources to engineering and clinical development of PLASMAShield.

16. Rostan Medical, Inc. is a corporation organized under the laws of Florida with its principal place of business in Boca Raton, Florida, within this District. Rostan Medical, Inc. is a sister company of Plasmatica, Ltd. that was created to commercialize Plasmatica, Ltd.'s products in the United States. Rostan Medical, Inc. conducts sales and distribution operations in and from its Boca Raton headquarters in this District.

17. Medtronic, Inc. is a Minnesota corporation with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432. Medtronic sells surgical devices and related products throughout the United States, including in this District. Medtronic sells laparoscopic anti-fog products, including the Clearify Visualization System, as well as monopolar and advanced bipolar energy products, and other products that Medtronic uses in its exclusionary bundles.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18. This Court has subject-matter jurisdiction over Plasmatica's federal antitrust claims under 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331 and 1337.

19. This Court has personal jurisdiction over Medtronic because Medtronic regularly transacts business in Florida, sells medical devices to hospitals in Florida, contracts with hospitals and GPOs whose members include Florida hospitals, and has engaged in conduct that has caused anticompetitive effects in Florida and throughout the United States, including effects on Plasmatica's U.S. sales and distribution operations, which Plasmatica conducts from Boca Raton, Florida.

20. Venue is proper in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c). Medtronic transacts business in this District, has caused injury in this District, and its anticompetitive conduct has affected Plasmatica's U.S. sales and distribution, which are conducted in and from Boca Raton, Florida, in this District. A substantial part of the events giving rise to Plasmatica's claims occurred in this District, including Medtronic's exclusionary contracting with, and conduct directed at, hospitals in this District. The resulting blocked trials and lost sales that Plasmatica experienced for such hospitals occurred in this District.

21. Medtronic's conduct occurs in and affects interstate commerce. Laparoscopic anti-fog devices, accessories, related products, and unrelated bundled products are manufactured, distributed, sold, and shipped across state lines. Medtronic's conduct and contracts with GPOs, hospitals, and hospital systems affect purchasing throughout the United States and directly affect the price, output, availability, and sale of medical devices in interstate commerce.

## FACTUAL ALLEGATIONS

### A. Relevant Products and Demand

22. Clear visualization is the foundation of laparoscopic surgery. Unlike open surgery, in which the surgeon views the operative field directly, laparoscopic surgery is performed through small incisions and trocars, and the surgeon sees the anatomy only through the image the laparoscope transmits to a monitor. Lens performance can affect operative time, tissue handling, complications, and patient safety because surgeons cannot safely dissect, staple, seal, or suture what they cannot see.

23. Fogging occurs because the laparoscope, which is at or near room temperature, is introduced into a body cavity that is warm and humid. These conditions are created by the patient's body temperature and by the carbon dioxide used to insufflate the cavity. In such conditions, water vapor condenses on the cooler lens and fogs it. In addition, surgical smoke generated by electrosurgical and ultrasonic instruments, together with blood, fat, irrigation fluid, and tissue debris, adheres to and soils the lens over the course of a procedure.

24. When the lens fogs or soils, the surgical field is often obscured at precisely the moments visualization matters most. Traditionally, the surgeon must stop the operation, withdraw the laparoscope through the trocar, wipe, warm, or chemically treat the lens, reinsert the scope, and reorient. This process often occurs many times in a single case. Each cleaning cycle interrupts the flow of the operation, prolongs operative and anesthesia time, increases cost, and creates risk, including the risk of losing visualization during important steps of the procedure. Hospitals and surgeons therefore place substantial value on products that keep the lens clear with minimal interruption.

25. Historical approaches to lens defogging have included pre-warming the scope in heated saline or water, applying surfactant anti-fog solutions to the lens, and wiping the lens intracorporeally on tissue. These practices are transient, must be repeated as the lens re-fogs and soils, and do not eliminate the interruptions that degrade laparoscopic surgery. Laparoscopic anti-fog devices were developed to address this problem. They are dedicated products designed to prevent, reduce, or eliminate lens fogging and soiling and to maintain clear intraoperative visualization. Hospitals typically purchase them under GPO and hospital-system contracts.

26. Medtronic sells laparoscopic anti-fog products, including the Clearify Visualization System. According to Medtronic, Clearify is an all-in-one, single-use system built around a disposable battery-operated hub containing a warmed anti-fogging solution reservoir, cleaning pads, a white balancer, and related components.

27. Plasmatica sells the PLASMAShield system. PLASMAShield takes an innovative, preventive approach by using a brief 10-second cold-plasma treatment of the laparoscope lens, performed before the scope enters the patient, to activate the lens surface and render it super-hydrophilic. As a result, liquid contacting the lens spreads into a thin, transparent film instead of fogging the image. This process allows the lens to remain activated throughout the procedure. PLASMAShield thereby reduces or eliminates the need to withdraw the scope for cleaning.

28. Plasmatica offers and positions PLASMAShield as a direct alternative to Medtronic's Clearify system across the same laparoscopic procedures. PLASMAShield is thus a ready, regulatory-cleared, and clinically competitive substitute that hospitals and surgeons could adopt in place of Medtronic's laparoscopic anti-fog products but for Medtronic's exclusionary contracting.

29. PLASMAShield outperforms Clearify. In clinical use, PLASMAShield has kept the lens clear of fog for the full duration of procedures lasting many hours without any need to remove the scope. In contrast, Clearify's heated-solution approach requires the surgeon to remove and re-treat the scope and requires multiple Clearify units for longer procedures. Surgeons who have used PLASMAShield credit it with maintaining continuous visibility, reducing workflow interruptions, and improving efficiency and patient safety.

30. PLASMAShield is also Greenhealth Approved, a designation for products that meet the criteria of Health Care Without Harm and Practice Greenhealth.

31. When Plasmatica has had an opportunity to conduct trials of PLASMAShield, it has performed very well compared to Clearify. For example, one leading hospital conducted a study that involved 26 cases with an average duration of 4.6 hours. During that entire study, the scope was removed only once during a single nine-hour surgery due to fogging. The surgeons for the remaining surgeries, including some approximately ten hours in length, never had to remove the scope due to fogging. And even the one scope removal was likely due to a new user who was not familiar with the device and would not have to remove the scope for future surgeries. In comparison, laparoscopes treated with Clearify would have to be removed several times in each surgery. In longer surgeries exceeding five hours, the Clearify unit itself would need to be replaced, requiring two or even three Clearify units to complete the surgery.

32. Other trials have exhibited similar results. Several trials were completed with zero instances of the scope having to be removed due to fogging. Other trials experienced a very small handful of scope removals that were attributed to technique such that training in best practices prevented recurrence entirely. Another series of two trials across a large hospital system was completed with just four scope removals.

33. Clearify also requires disposable batteries to operate whereas PLASMAShield does not. Clearify products use an estimated 8 million batteries per year and the batteries alone account for an estimated 200 tons of hospital waste per year. A Life Cycle Assessment study comparing PLASMAShield to Clearify shows that Clearify produces significantly more carbon emissions than PLASMAShield. According to the study, the disposable components of the Clearify Visualization System generate over thirty-five times more carbon emissions per unit than the PLASMAShield disposable components (61.06 kg $CO_2e$ vs. 1.67 kg $CO_2e$). PLASMAShield is thus significantly more environmentally friendly compared to Clearify.

**B. Group Purchasing Organizations**

34. Hospitals often purchase surgical products through GPOs and GPO-negotiated agreements. GPOs aggregate purchasing and negotiate supplier contracts for large groups of hospitals, purportedly to obtain better deals on behalf of the hospitals. GPOs, however, have dual motives and do not always represent the interests of their member hospitals. GPOs receive "administrative fees," which are a percentage of all sales made under their contracts. This creates an incentive for GPOs to favor the suppliers that pay them the most rather than the suppliers that offer hospitals the best products at the lowest prices.

35. Because of this conflict of interest, GPOs previously agreed to limit administrative fees to 3% of sales, but in more recent years GPOs have departed from that limit. Medtronic pays GPOs more than 3% in exchange for a greater purchasing commitment, further aligning the GPOs' financial interests with Medtronic's exclusionary objectives rather than with the interests of their member hospitals.

36. In addition, some GPOs, such as the Resource Group, do not allow their member hospitals to enter into local agreements, and instead require that purchasing proceed through their

group purchasing arrangements. The Resource Group works with suppliers to drive and enforce member hospitals' compliance with their purchasing commitments.

37. Medtronic enters into sole-source and dual-source agreements with GPOs that, coupled with the internal policies and practices of those GPOs, coerce GPO members into entering exclusionary contracts with Medtronic that include market-share purchase requirements and exclusionary bundling. These agreements discourage GPO members from purchasing products from Medtronic's non-GPO rivals.

38. Medtronic uses GPO and hospital contracting to deploy its portfolio breadth as exclusionary leverage. The bundle allows Medtronic to condition discounts, rebates, or preferred pricing across multiple product lines on a hospital's continued purchase of Medtronic laparoscopic anti-fog products. This leverage is especially powerful because hospitals purchase far more than anti-fog devices from Medtronic and rely on Medtronic products in multiple operating-room categories.

39. Hospitals enter into long-term exclusionary agreements with Medtronic by one of two routes: a hospital either selects an enhanced pricing tier within a GPO agreement with Medtronic, or it enters into a local agreement directly with Medtronic.

40. Medtronic bundles in its GPO agreements and in local agreements to reach the same exclusionary result. Medtronic bundles whenever possible, at every stage of the contracting process, to leverage its unmatched portfolio of products and to use pricing penalties to exclude potential rivals such as Plasmatica.

41. For example, a public document from another case showed that, when a GPO would "not sign a bundled Endo/Energy/Suture/Trocar agreement," Medtronic "found a way around it" by "including a local LOC" that conditioned "max value" on members committing across all of

those categories. Thus, Medtronic forecloses rivals by engaging in bundling and the other exclusionary conduct alleged herein both at the GPO and local level.

## C. The Relevant Market

### 1. Laparoscopic Anti-Fog Devices Are a Distinct Relevant Market

42. The relevant product market is the market for laparoscopic anti-fog devices. Laparoscopic anti-fog devices are dedicated products designed to prevent, reduce, or eliminate fogging and soiling of the laparoscope lens before and during minimally invasive surgery to maintain clear intraoperative visualization. Medtronic's Clearify Visualization System and Plasmatica's PLASMAShield system are laparoscopic anti-fog devices.

43. Laparoscopic anti-fog devices are designed for minimally invasive surgery. Such anti-fog devices are used across general, bariatric, colorectal, thoracic, gynecologic, urologic, hepatobiliary, and other laparoscopic procedures.

44. Hospitals consider several factors when evaluating laparoscopic anti-fog devices, including the effectiveness and duration of fog prevention, the ability to maintain image clarity, the number of scope removals required, workflow integration and ease of use, setup and treatment time, per-procedure cost, reliability, and clinical support. Because these factors differ materially across product types, the relevant products are evaluated as a distinct type of product.

45. The market for laparoscopic anti-fog devices exhibits each of the practical indicia of a distinct product market or, at a minimum, a distinct submarket of any broader market for surgical anti-fog equipment.

46. *Industry and public recognition.* Industry participants, surgeons, hospitals, GPOs, and regulators all recognize laparoscopic anti-fog devices as a distinct type of product. Medtronic markets Clearify as a dedicated "Visualization System," with its own product literature directed to

the hospitals that evaluate laparoscopic anti-fog devices. Hospital supply-chain personnel and surgeons likewise evaluate laparoscopic anti-fog devices as their own product line, conducting dedicated trials of PLASMAShield against Clearify and, as alleged below, weighing a switch as to such products.

47. *Peculiar characteristics and uses.* Laparoscopic anti-fog devices have physical and functional characteristics that set them apart from every other product used in the operating room. They are systems with dedicated, single-procedure components whose sole function is to keep the laparoscope lens clear during minimally invasive surgery. Clearify is a self-contained, single-use system built around a battery-operated hub containing a warmed anti-fog solution reservoir, cleaning pads, and a white balancer. PLASMAShield is a cold-plasma system that activates the lens surface in seconds before the scope enters the patient. Both are engineered to work with hospitals' laparoscopes and trocars. And both are used in the operating room during the procedure. Their use is equally specialized. They are used in laparoscopic and other minimally invasive procedures, in which the surgeon can see the operative field only through the image the laparoscope transmits. And they are selected on criteria unique to that use, including the duration of fog prevention, the number of scope removals required, and setup and treatment time. No other product or practice shares these characteristics or performs this function with comparable effectiveness.

48. *Unique production facilities.* Laparoscopic anti-fog devices are manufactured with specialized facilities, equipment, processes, technology, and know-how that are not used to produce anti-fog solutions or other surgical products. Producing PLASMAShield requires the design and manufacture of a cold-plasma base unit together with dedicated single-use disposables. It was the product of ten years of development, more than 50 person-years of engineering and

clinical work, and tens of millions of dollars of investment. Producing Clearify likewise requires the manufacture of a purpose-built, battery-operated hub with a heated solution reservoir and its associated single-use components. As alleged below, manufacturing these devices requires FDA clearance, substantial capital investment in facilities and machinery, a portfolio of technology and intellectual property, and engineers, designers, and physicians with specialized expertise.

49. *Distinct customers.* The customers for laparoscopic anti-fog devices are the hospitals, health systems, and surgical facilities that perform laparoscopic and other minimally invasive procedures, which purchase the products for use by the surgeons who perform those procedures. Within those institutions, laparoscopic anti-fog devices are purchased through a distinct process. Minimally invasive surgeons and operating-room staff evaluate them through product demonstrations, hands-on evaluation, and clinical trials. Staff receive product-specific training before conversion.

50. *Distinct prices.* Laparoscopic anti-fog devices are sold at distinct prices that, absent Medtronic's anticompetitive conduct, would bear no relationship to the prices of other products used in laparoscopic surgery. Simple anti-fog solutions sell for a small fraction of the price of a laparoscopic anti-fog device.

51. *Sensitivity to price changes.* Demand for laparoscopic anti-fog devices is insensitive to changes in the prices of products outside the market and, absent Medtronic's anticompetitive conduct, would be sensitive to competition within it. Hospitals and surgeons have not responded to price changes by reverting to other alternatives because those alternatives do not deliver continuous visualization and would reintroduce the interruptions, added operative and anesthesia time, and patient risk that laparoscopic anti-fog devices are designed to reduce or eliminate.

52. *Specialized vendors.* Laparoscopic anti-fog devices are sold by specialized vendors through specialized channels. They are sold by medical-device manufacturers, including Medtronic and Plasmatica, through dedicated surgical sales forces and clinical specialists. Those individuals call on operating-room personnel, provide in-service and product-specific training, and support the demonstrations, hands-on evaluations, and clinical trials that precede any conversion.

53. Consistent with the above allegations, a hypothetical monopolist of laparoscopic anti-fog devices in the United States could profitably impose a small but significant non-transitory increase in price over the competitive price, because surgeons and hospitals would not, in response, switch in sufficient numbers to other products or practices to defeat the increase. Medtronic's ability to impose and sustain supracompetitive prices, as alleged herein, confirms that laparoscopic anti-fog devices are a distinct relevant market.

**2. Other Products Are Not Reasonable Substitutes**

54. Simple anti-fog solution is not a reasonable substitute for laparoscopic anti-fog devices. Such products are not devices and are fundamentally different in function and form from laparoscopic anti-fog devices. They are substantially less effective and are sold at a small fraction of the price of laparoscopic anti-fog devices. A hospital or surgeon would not respond to a small but significant non-transitory increase in the price of laparoscopic anti-fog devices by abandoning them in favor of such simple solutions, and such products do not discipline the pricing of anti-fog devices. The ability to apply inexpensive anti-fog solution does not place these products in the market for laparoscopic anti-fog devices. They are not reasonable substitutes and are not part of the relevant market.

55. To the extent simple anti-fog solutions are reasonable substitutes for laparoscopic anti-fog devices and in the same market, the relevant market may be defined in the alternative to

also include such products. As discussed below, Medtronic maintains monopoly power over the market even if it is defined more broadly to include such products. This alternative market would not include other laparoscopic devices, such as cameras, insufflators, or smoke evacuation products because such categories perform distinct functions and are not interchangeable.

**3. The Relevant Geographic Market Is the United States**

56. The United States is the area in which Medtronic faces competition for the relevant products and the only area to which U.S. hospitals can practically turn for alternative sources of supply. Laparoscopic anti-fog devices sold to U.S. hospitals must satisfy U.S. regulatory requirements and must be supported by U.S.-based sales, clinical, contracting, logistics, and service infrastructure. A supplier that offers the relevant products only outside the United States is not a viable alternative for U.S. hospitals, which cannot practically turn to such products in response to a price increase, and is not part of this market. Thus, the relevant geographic market is the United States.

**D. Medtronic's Market and Monopoly Power in the Relevant Market**

57. Medtronic has monopoly power in the market for laparoscopic anti-fog devices or, alternatively, the expanded market discussed above.

**1. Medtronic's Dominant Share in the Relevant Market**

58. The principal participant in the market for laparoscopic anti-fog devices is Medtronic, which sells the Clearify Visualization System. Another participant is Plasmatica, which sells the PLASMAShield system.

59. Medtronic possesses a dominant share of the relevant market: Medtronic holds an approximately 80% share of the market for laparoscopic anti-fog devices and every other supplier is substantially smaller.

60. Even if the market were expanded to include simple anti-fog solutions, Medtronic still possesses a dominant share. The volume of those products is insubstantial compared to the volume of laparoscopic anti-fog devices. In that alternative market, the market shares do not materially change. Medtronic holds more than 75% share, and every other supplier is substantially smaller.

**2. Barriers to Entry and Expansion**

61. Medtronic's market power is protected by high barriers to entry and expansion ("market barriers"). Some of the most significant market barriers are Medtronic's own trade restraints, exclusionary practices, entrenched market position, and history of anticompetitive conduct, which are described in more detail below.

62. Another market barrier is the requirement to form long-term agreements with GPOs, which provide a "gateway" to customers. Agreements with GPOs last many years and are often renewed.

63. An additional market barrier is the frequent requirement to form long-term sales relationships with hospitals. These relationships are cultivated through the customer's experience with the supplier's service team and its use of the technology. Medtronic's restrictive contracting practices block new, more effective competitors from building these relationships and gaining the customer's comfort with the competitors' new technology. Medtronic has numerous such relationships and contracts, including contracts with GPOs and long-term supply contracts at hospitals nationwide.

64. Regulatory requirements are another market barrier. Sellers must obtain regulatory clearance from government agencies, including the FDA, to market, distribute, and sell medical devices in the United States.

65. Another market barrier is that manufacturers must make large capital investments, including in facilities and machinery, to produce enough product to sell profitably at market prices.

66. Another market barrier is that participation in the industry requires a substantial portfolio of technology, intellectual property, and know-how. Sellers may need to license intellectual property rights from others and to develop their own portfolio.

67. An additional market barrier is the need to employ highly skilled professionals with specialized technical proficiency, including engineers, designers, and physicians.

68. Existing competitors also cannot expand their sales rapidly enough to discipline Medtronic's prices. Rivals can convert hospitals to competing laparoscopic anti-fog devices only after time-consuming product demonstrations, training, and clinical evaluations. And Medtronic's de facto exclusive agreements lock hospitals into Medtronic's portfolio for years, which forecloses rivals from competing for that volume even where their products are preferred and lower priced. As a result, neither Plasmatica nor any other competitor can defeat a small but significant non-transitory increase in Medtronic's prices by simply expanding sales.

69. Medtronic's long-term contracts magnify these barriers. Long-term and staggered agreements make it difficult for hospitals to align conversion opportunities across product categories and deny rivals fair opportunities to compete.

70. Most of these barriers remain unchanged even if the market were expanded to include simple anti-fog solutions. While such products require less capital investment and potentially less technology and intellectual property, the other barriers are the same. For example, Medtronic's anticompetitive conduct would remain a substantial barrier; such products still require regulatory clearance; and competitors would still need a highly skilled workforce. Medtronic's conduct likewise prevents existing competitors from expanding sales rapidly enough to discipline

Medtronic's prices, and the long-term nature of Medtronic's contracts magnifies the barriers. Thus, Medtronic's market power in the alternative broader market is also protected by high market barriers.

**3. Medtronic's Monopoly Power**

71. Medtronic's dominant market share, portfolio breadth, installed base, and contracting power, the significant barriers to entry and expansion described above, and the inability of existing competitors to expand sales rapidly enough to discipline Medtronic's prices together demonstrate that Medtronic wields monopoly power in the relevant market or the alternative relevant market discussed above. Medtronic faces no realistic threat that any existing or potential competitor could readily deprive it of sales by expansion or entry if Medtronic imposes a small but significant non-transitory increase in price, or imposes other onerous commercial terms that its customers would not accept in a competitive market. Direct evidence confirms the same conclusion: Medtronic profitably charges and sustains supracompetitive prices, can raise those prices without any corresponding cost increase, and excludes a lower-priced, at least equally efficient rival, all without losing significant share.

**4. Medtronic's Power Over Its Bundle**

72. Medtronic possesses market power over the products in its bundle sufficient to impose penalty pricing should a hospital seek to purchase its anti-fog devices from a rival such as Plasmatica. A hospital that rejects Medtronic's bundle, or moves a single product such as laparoscopic anti-fog devices to a rival, thus faces substantially higher prices.

73. Assembling an alternative bundle is impractical because it would require a hospital to negotiate multiple separate contracts, to ensure consistent product quality across categories, and

to risk reputational harm. Further, Medtronic's staggered, non-coterminous contracts impose additional penalties that entrench the barriers to switching.

74. No other company has a product portfolio comparable in breadth to Medtronic's. Medtronic alone offers the full range of operating-room product categories that hospitals purchase. Medtronic has the exclusive capacity to assemble the multi-product bundles that it leverages against Plasmatica and other rivals. No competitor, including Plasmatica, can offer a comparable bundle or replicate the portfolio-wide pricing and penalties that Medtronic uses to foreclose competition. Medtronic's own documents concerning its surgical-product portfolio acknowledge that it maintains a "monopoly" on "portfolio breadth" and characterize Medtronic's bundle as the "ultimate gorilla."

75. Hospitals purchase substantial volumes of monopolar products, advanced bipolar devices, anti-fog devices, and other operating-room products. Medtronic's portfolio breadth allows it to impose a portfolio-wide financial penalty on hospitals that wish to move even one product to a rival. The threatened loss of pricing across the portfolio overwhelms the economics of switching anti-fog devices to Plasmatica or other rivals.

76. Plasmatica sells a single type of product, a laparoscopic anti-fog device, and has nothing approaching Medtronic's portfolio of other products. Plasmatica does not sell the many other products that Medtronic bundles. Plasmatica therefore cannot compensate hospitals for the penalty pricing they would pay across Medtronic's portfolio if they moved their anti-fog device purchases to Plasmatica. Because neither Plasmatica nor Medtronic's other would-be rivals offer Medtronic's range of products, none can offer offsetting or greater discounts to compensate for the penalties a customer would incur by switching.

77. Medtronic exercises monopoly power or significant market power over products in its bundle, such as monopolar devices and advanced bipolar devices. Medtronic has an approximately 60% share in monopolar devices and over 70% share in advanced bipolar devices. And Medtronic's monopoly power or significant market power over such products is supported by many of the same entry barriers discussed above. Both products require long-term GPO and hospital relationships, FDA regulatory clearance, large capital investments, substantial technology and intellectual-property portfolios, and highly skilled personnel. And, in the case of advanced bipolar devices, Medtronic is an adjudicated monopolist that has been proven to have engaged in anticompetitive conduct to harm competition.

**E. Medtronic's Anticompetitive Conduct**

78. Medtronic's anticompetitive conduct consists of several related and mutually reinforcing types of conduct, each of which is addressed in turn below. First, Medtronic prevents hospitals from even conducting rival product trials. Second, when a rival does win a trial with a better product at a lower price, Medtronic uses exclusionary bundling to make it impossible to close the sale. Third, Medtronic's long-term agreements impose strict multi-product market-share-maintenance requirements that lock up customers for years, producing de facto exclusive dealing that substantially forecloses competition. Medtronic enforces those agreements through compliance forms, audits, and the threat of imposing penalty pricing across every product. These categories of conduct operate in sequence, reinforce one another, and, alone and together, substantially foreclose competition without any legitimate business justification.

### 1. Medtronic Uses High Market-Share Requirements, Threats, and Other Conduct to Stop Hospitals From Even Conducting Product Trials

79. Surgeons and operating-room staff will not convert from an incumbent laparoscopic anti-fog device without first evaluating a competing device. They generally require product demonstrations, hands-on evaluation, and clinical trials before converting. Product trials are therefore a necessary step to any competition for a hospital's anti-fog device business.

80. Medtronic stops that step from occurring. Hospitals interested in evaluating PLASMAShield face the threat of portfolio-wide penalty pricing, including the loss of pricing, rebates, or committed-tier benefits across many Medtronic products. These are penalties that, as alleged above, Plasmatica cannot match with its pricing as to PLASMAShield. A hospital therefore risks being saddled with penalty prices across categories it buys in volume merely to trial a rival anti-fog device.

81. Hospitals have told Plasmatica, in their own words, that this threat is why they will not trial PLASMAShield. One hospital declined a trial of PLASMAShield because "this alternative may effect our preferred pricing agreement with Medtronic using Clearify at this time." Another "could not even allow [PLASMAShield] to be tried in the operating room because doing so could interfere with [the hospital's] bundled purchasing agreements with Medtronic and adversely affect pricing across numerous other products covered under those contracts." And at another large hospital system, surgeons dissatisfied with Clearify's performance wanted to evaluate PLASMAShield, but the system's supply-chain personnel declined even to conduct a trial because of the system's contract with Medtronic. In each instance, the hospital's decision had nothing to do with PLASMAShield's performance or price. The decision turned on what

Medtronic could do to the hospital's pricing on other products if the hospital so much as evaluated a rival anti-fog device.

82. Medtronic's high market-share commitments prevent trials. As a hospital's required compliance with Medtronic's contracts approaches 80% or higher, the hospital has too little remaining volume to obtain the quantity of a competing product necessary to conduct a meaningful trial. What little leeway exists is typically consumed by specialty or surgeon-preference items. The practical effect is that hospitals cannot evaluate PLASMAShield during the term of a Medtronic agreement. For example, one large system reported exactly that to Plasmatica: a trial of PLASMAShield "couldn't move forward because Clearify was already in use and under contract with Medtronic."

83. Medtronic's now-public documents demonstrate that Medtronic instructs its salespeople that if "accounts begin competitive trials," Medtronic should "communicate violation of our pricing agreements and be prepared to take them to access/list tier." Other public documents describe increasing pricing midway through a competitor's trial and taking steps to "eliminate the competition from getting a window that would allow for a trial" of rival products. Hospitals have declined to trial PLASMAShield for this reason.

84. By preventing or terminating trials, Medtronic imposes enormous costs on rivals and hospitals, and it ensures that surgeons never gain the clinical experience necessary to convert. Hospitals cannot make informed competitive choices when Medtronic's contracts prevent meaningful product trials or punish hospitals economically for conducting them. Thus, hospitals renew their Medtronic agreements without any meaningful competitive process, and the foreclosure persists through successive renewals. Product trials are also resource-intensive, which magnifies the harm when Medtronic blocks them. Indeed, conducting a single hospital trial of a

competing device can take many months, involve many operating-room personnel across multiple surgical services, require dozens of hours of work per participant, and cost substantial sums.

**2. Medtronic's Exclusionary Bundling Makes It Impossible to Compete**

85. Even where a rival conducts a successful trial, offers a substantially lower price, and the hospital desires to switch, the rival still cannot displace Medtronic because Medtronic uses exclusionary bundling to make it impossible to close the sale. Clearify marketing materials available online tout the "Power of Covidien"[2] and highlight that customers using the "full array" of products "within Covidien's extensive portfolio" will "enhance the cost-to-value advantages for [their] facility." Medtronic offers bundled agreements that condition so-called discounts, rebates, or pricing tiers on a hospital's purchases across multiple product categories. The bundled discount is not a simple volume discount on laparoscopic anti-fog devices; it is a portfolio-wide mechanism that forces Plasmatica to offer a price on PLASMAShield that offsets discounts and penalties across products it does not sell, even where Plasmatica's device offers superior value.

86. Hospitals have described this mechanism to Plasmatica in precisely these terms. After reviewing the "financials" and how to "move forward with" PLASMAShield, one hospital's representative concluded that "using plasma shield in leu [sic] of our current product (Covidien) will drop us down in their tiered pricing," and that, as a result, "we will not be able to use this product." Another likewise explained that "Covidien (Medtronic) has bundled the Clearify with other products and it didn't make sense from a pricing perspective." And a surgeon at another hospital who was interested in PLASMAShield laughed at the prospect of replacing Clearify, calling it a "nonstarter" because of the "concern about Medtronic raising pricing on other products

---

[2] Medtronic acquired Covidien but continues to use "Covidien" in its marketing and product names.

if they lost this business." None of these hospitals objected to PLASMAShield's performance. Each was blocked by the penalty prices Medtronic would impose on other products in its portfolio if the hospital purchased PLASMAShield.

87. The total exclusionary "discount" on Medtronic's bundled products is very significant because of the volume and total cost of those products. Hospitals obtain that so-called "discount" on the other products only if they also agree to purchase a high percentage of their laparoscopic anti-fog devices from Medtronic. To match the total so-called "discount" of Medtronic's exclusionary bundle, Plasmatica would have to sell PLASMAShield at a loss.

88. Medtronic is thus effectively selling its laparoscopic anti-fog devices below cost when the exclusionary discounts on its entire bundle are attributed to those devices. Plasmatica is at least as efficient a producer of laparoscopic anti-fog devices as Medtronic. It has invested substantial resources in making its production process, including in particular its process for the disposable unit, efficient. Plasmatica's disposable unit is also simpler to manufacture than Clearify. Plasmatica has also repeatedly undercut Medtronic's pricing in an effort to win sales. However, hospitals have indicated to Plasmatica that they cannot purchase Plasmatica's laparoscopic anti-fog devices at any price because of the loss of Medtronic's so-called discounts on other products. If an at least equally efficient competitor cannot win sales at any price, Medtronic's effective price for its laparoscopic anti-fog devices must fall below its average variable costs when the bundled discounts are attributed to those devices. Thus, Medtronic's bundled exclusionary discounts fail the discount attribution test.

89. Medtronic's conduct is thus not a simple above-cost price cut on a single product, but rather a portfolio-wide bundled "discount" that actually threatens hospitals with penalty prices. Indeed, Medtronic's "discounts" are not genuine price reductions. As alleged above, Medtronic

inflates its non-bundled prices so that the difference between its bundled and non-bundled pricing functions as a penalty for buying from a rival rather than a reward for volume. Moreover, Medtronic's scheme is not purely price-based conduct. It is imposed and enforced through contractual conditions, market-share commitments, compliance audits, threats, and rights of termination. It is thus exclusionary under the standards governing exclusive dealing and de facto exclusivity even without regard to any price-cost test.

90. Medtronic's now-public documents, including its "Creative Contracting Strategy," confirm that Medtronic's cross-product design is deliberate. A Medtronic "Protect the House" presentation directs the sales force to "[b]undle" Medtronic product categories. Medtronic celebrated "executing a price increase on the 'access tiers'" of certain agreements—approximately "$3.17M annually"—and explained that the increase would "provide [it] further leverage" to cause customers to make a further commitment. Medtronic's now-public documents identified as a benefit that Medtronic "[u]pdated GPO pricing agreements that outline more punitive responses for competitive usage."

91. Medtronic well understands that its bundles prevent competition on the merits of individual product categories. A Medtronic email expressed concern that "breaking it up exposes us" because there would be "more choice" and "more options." Medtronic thus recognizes the risk it faces if forced to compete head-to-head against superior rival products.

92. Hospitals are not, as a practical matter, economically capable of declining or terminating Medtronic's bundled agreements. Hospitals and surgeons want to adopt Plasmatica's lower-priced, better-performing product and have sought to do so. But Medtronic's portfolio-wide penalties prevent them, and Medtronic's monopoly leverage subjects even the largest and most sophisticated hospital systems to these terms. For example, one large hospital system conducted

a successful trial of PLASMAShield, and its surgeons highly recommended adopting it. The system nonetheless rejected PLASMAShield because of the impact a conversion would have on its Medtronic rebates.

93. Medtronic also folds price increases into its bundled "wrap" agreements so that customers will not notice them. After deciding to "pass along a meaty price increase," a Medtronic regional vice president of sales explained that "the inclusive wrap" "becomes an attractive way to defend our business and/or ***hide*** a price increase," and testified that "price increases" would "just be included in the wrap and hope not to be noticed." A now-public Medtronic internal revenue review separately identified, as an "opportunit[y]," offering "package deals [***hide price***, build loyalty]."

94. Medtronic's concealment of its price increases compounds the exclusionary effect of its bundle. Because Medtronic buries its increases in the "wrap" and prices its many products together rather than transparently, hospitals cannot readily determine the true price of any individual product, the true size of the portfolio-wide "discount," or the true magnitude of the penalty for moving a single product to a rival. This opacity deters switching to rivals such as Plasmatica and enables Medtronic to sustain prices that visible, stand-alone increases might expose to competitive response. The concealment also confirms that Medtronic's conduct is not a procompetitive "discount" and serves no legitimate business purpose. A genuine discount that passed through cost savings would be disclosed and welcomed, but the so-called "discounts" produced by hidden increases operate as a penalty for purchasing from a rival rather than as a true price reduction. Medtronic thus uses the bundle to suppress competition rather than to compete on price or quality.

95. Medtronic also refuses to allow carve-outs in which a hospital would be allowed to purchase laparoscopic anti-fog devices from a smaller competitor like Plasmatica without impacting its compliance. Such a carve-out would allow Medtronic to continue to use its bundle in competing against larger companies that sell many product categories while preserving competition from smaller competitors like Plasmatica. Medtronic's refusal to allow such a carve-out demonstrates that Medtronic's bundling is designed to suppress competition rather than to compete against larger companies. For example, following a successful trial of PLASMAShield, a large hospital system determined that purchasing PLASMAShield would "disrupt" its contract with Medtronic and sought a carve-out that would allow it to buy PLASMAShield without penalty. Medtronic refused, and the hospital was unable to purchase PLASMAShield.

**3. Medtronic's Long-Term Market-Share Commitments Lock Up Customers for Years, Producing De Facto Exclusive Dealing**

96. When a hospital purchases from Medtronic rather than a rival, the consequence is not merely a single lost transaction. The hospital enters an agreement that requires it to maintain a high share of its purchases from Medtronic across numerous surgical products, including laparoscopic anti-fog devices, commonly 80%, 90%, or higher, for the multi-year term of the agreement. Thus, a single exclusion becomes a years-long, portfolio-wide exclusion of the rival. Together, these high commitment thresholds, the compliance machinery that enforces them, and the long, staggered terms of Medtronic's agreements operate as de facto exclusive dealing.

97. Hospitals describe Medtronic's agreements in exactly these terms: the existence of a Medtronic agreement is the reason PLASMAShield cannot be purchased or even evaluated. A surgeon at one large hospital system was interested in PLASMAShield and "would love to help" bring it in, but "can't because of Medtronic contract." Another hospital, despite its surgeons'

interest in trialing PLASMAShield, could not do so because, in its words, "[W]e are contracted with Medtronic." And another declined even to trial PLASMAShield because its Medtronic contract "goes for another 4 years." That single agreement thus excludes PLASMAShield from a large hospital system for at least four more years and, if the agreement is renewed without a competitive process, indefinitely.

98. Medtronic's now-public contracting playbook, in a chapter titled "Leveraging the Portfolio," structured its tiered discounts and conditioned the best pricing on a hospital reaching high compliance thresholds (e.g., "85% compliance") across multiple categories "PLUS 1 AST COT (Stapling or Energy)." Medtronic expressly conditions improved pricing on commitments in additional product categories. The document also directed sales personnel to identify each account's "pain points" to craft the appropriate proposal.

99. Medtronic's agreements for its surgical devices run three to five years with 80% to 90% commitments. Missing the target as to one product can trigger higher prices for all the products, causing the hospital to lose its pricing across every product.

100. Medtronic enforces these commitments through compliance forms, purchase-record disclosures, and audits. It reserves the discretion to determine compliance and terminate the entire agreement and revoke its so-called discount pricing across every product. Medtronic thus audits the purchases, the hospital fills out a form, and Medtronic reserves the right to terminate the agreement and revoke the pricing and move it to the access tier. This results in penalty pricing across the portfolio.

101. In now-public documents, Medtronic instructed its employees that if a customer "slip[s] $1 below the 85% commitment," Medtronic should "take them to Access," the higher default penalty price available for merely being a member of a particular GPO. Medtronic also

confirmed that when a customer is "not compliant to the 85% agreement," Medtronic has the "ability [to] punitively raise their pricing." Medtronic described the strategy as "economic leverage," including "additional economic leverage" from "price increases to the access tiers." These arrangements are designed to leverage Medtronic's portfolio and to lock customers in, rather than pass through genuine efficiencies. Medtronic need not carry out its threats frequently for this machinery to foreclose competition. The purpose and effect of such a program is to deter hospitals from ever purchasing from a rival. The credible threat of portfolio-wide penalties polices hospitals' purchasing, as hospitals' statements to Plasmatica confirm.

102. The foreclosure is not only portfolio-wide but enduring. Medtronic's contracts are long-term, staggered, and have layered commitments. They are typically at least three years long and are often extended and renewed. Thus, they foreclose competition on an effectively perpetual basis. Because hospitals cannot trial or convert during a term, they routinely renew without ever considering rivals, and the long lead times required to evaluate, train on, and adopt a new laparoscopic anti-fog product compound the foreclosure: each renewal extends the exclusion before any rival can establish itself. Medtronic's agreements therefore foreclose competition for far longer than any single term.

103. Medtronic's agreements afford hospitals no realistic ability to terminate or exit. Because departing even at the margin triggers penalty pricing across Medtronic's entire portfolio, hospitals face overwhelming pressure to remain in exclusive status. Thus, these are not short-notice, freely terminable contracts imposing only a de minimis constraint on competition. They are long-term exclusive commitments from which a hospital cannot, as a practical matter, exit without incurring substantial penalties.

104. Although Medtronic's agreements purport to leave a 10% to 20% window for purchases from rivals, rivals cannot make substantial sales into that window. A hospital that falls even a dollar below its 80% to 90% commitment risks losing substantial so-called discounts across numerous product categories. The risk is greatest precisely where a rival's products are high quality because purchases of a better product like Plasmatica's PLASMAShield would only grow as physicians are exposed to the better product, which further threatens the hospital's compliance. Hospitals recognize as much. One hospital system told Plasmatica that it was "100% Medtronic so no room to get [PLASMAShield] in."

105. Through a combination of high commitment thresholds, compliance audits, portfolio-wide pricing penalties, staggered expiration dates, and the threat of revoking discounts across every product, Medtronic effectively prevents hospitals from purchasing meaningful volumes of anti-fog devices from Plasmatica for years at a time and requires hospitals, in practice, to obtain all or substantially all of their anti-fog device requirements from Medtronic. Medtronic's agreements are thus exclusive dealing agreements in operation and effect, and substantially foreclose competition in the relevant market.

106. Medtronic's now-public documents illustrate how tightly these commitments bind its customers. Medtronic described its own agreement that "ties in all COT's into one large agreement" such that "[c]reep on any of them puts their 5% wrap in serious jeopardy," calling it as "'iron clad' as an agreement can get." Other now-public documents celebrate that, through Medtronic's agreements, "one of our biggest customers is locked down for years to come." Medtronic's now-public document specifically discusses "widen[ing] the moat around [its] business." On a public earnings call, Medtronic's chief executive officer touted to investors that Medtronic has "very tight contracts that have been tested over time," such that even if Medtronic

has “a supply shortage” and “a competitor takes up that” business, Medtronic gets “that supply back” and is “right back to where we were based on the contract.”

**4. Medtronic’s Conduct Works Together to Exclude Rivals**

107. Medtronic’s categories of conduct operate together and each makes the others more effective. Medtronic’s threats and the market-share-maintenance requirements supply leverage that prevents trials in the first place because a hospital cannot afford to jeopardize its portfolio-wide pricing merely to evaluate one competing product. Where a trial nonetheless occurs and succeeds, the bundle defeats the conversion because the portfolio-wide penalties make the effective price a rival must offer negative. Medtronic’s concealment of its price increases compounds the exclusionary effect of its bundle. The long-term high market-share-maintenance requirements, compliance audits, and threats of termination convert each such defeat into a multi-year, portfolio-wide exclusion, and the staggered, renewing agreements extend it indefinitely.

108. The experiences of individual hospitals, alleged above and below, show how these categories of conduct combine in practice. At one large hospital system, PLASMAShield cleared every hurdle that competition on the merits could present: the hospital trialed the product (at substantial expense to Plasmatica), the trial succeeded, and the hospital wanted to buy it. The conversion nonetheless failed because purchasing PLASMAShield would “disrupt” the hospital’s portfolio-wide contract with Medtronic. When the hospital asked Medtronic for a carve-out that would have allowed it to buy PLASMAShield without penalty, Medtronic refused. At another hospital system, the trial likewise succeeded and the system’s surgeons highly recommended PLASMAShield, but the system rejected it because of the effect a conversion would have on its Medtronic rebates, leaving PLASMAShield foreclosed from a system with dozens of hospitals. At another hospital, the scheme operated one step earlier: surgeons dissatisfied with Clearify

wanted to evaluate PLASMAShield, but the system's supply-chain personnel refused even "a trial" because the Medtronic contract "goes for another 4 years." And at another hospital, the threat of "Medtronic raising pricing on other products" was so well understood that a surgeon interested in PLASMAShield laughed at the idea of replacing Clearify and called it a "nonstarter." Whether Medtronic's scheme defeats a rival before a trial, after a successful trial, or at the contracting table, the result is the same: the hospital remains locked into Medtronic's portfolio for years, and the rival is excluded.

109. Medtronic also specifically targets hospitals where rivals are gaining traction. Medtronic has offered additional bundled exclusionary discounts when it knows a rival is making inroads with a particular customer. For example, one now-public document shows that, after defeating a rival at particular accounts, Medtronic personnel described how Medtronic's "proposition leveraged the entire Medtronic portfolio" so that accounts would "see savings across the franchises" and thereby "close the gap" on the savings the rival could offer on only one product. Because Medtronic targets the specific accounts where a rival is competing, Medtronic's conduct forecloses competition even more broadly than its large market share alone would suggest. By blocking a rival at each account where the rival has a genuine opportunity to convert business, Medtronic effectively forecloses the rival across the market. For example, one now-public document directed the sales force to "[d]efend key share leadership positions" and to "[l]everage the full portfolio to maximize ability to mitigate losses and realize gains in key accounts." The presentation explains that "portfolio leverage" should be used at "both top priority at-risk accounts and targeted conversion accounts."

110. The above categories of conduct reinforce one another across accounts and over time. They produce a self-perpetuating scheme in which a rival like Plasmatica and other would-

be rivals can rarely obtain a trial, can almost never win a conversion even after a successful trial, and, on the rare occasion they do win a conversion, cannot expand because the surrounding hospitals remain locked into Medtronic's portfolio-wide commitments. The scheme thus holds Plasmatica below the critical mass of sales needed to keep investing, achieve efficient scale, and grow into an effective competitive constraint.

**5. Medtronic Lacks Any Legitimate Business Justification**

111. Medtronic lacks any legitimate business justification for its anticompetitive practices, each of which is unlawful and all of which Medtronic has cumulatively used to restrain trade and to monopolize, or in the alternative, attempt to monopolize, the relevant market. Even if Medtronic had a legitimate business purpose for any of these practices, it could readily accomplish that purpose through less restrictive means that would not have the same anticompetitive effects. Medtronic's conduct is not competition on the merits and it is not a restraint reasonably necessary to any competition on the merits. Medtronic has not acquired, maintained, or enhanced its dominant share through a superior product, lower prices, greater efficiency, or business acumen. Instead, Medtronic has done so through the blocking of product trials, exclusionary bundling, and de facto exclusive dealing—none of which makes Medtronic's laparoscopic anti-fog products better or cheaper or benefits hospitals, surgeons, or patients.

112. Medtronic's conduct contributes to creating and maintaining its monopoly power. It forecloses a substantial share of the relevant market, deprives rivals like Plasmatica of the trials and conversions necessary to discipline Medtronic's prices, and locks hospitals into Medtronic's portfolio for years. In maintaining its monopoly, Medtronic's dealings went beyond the needs of ordinary business and beyond the ambit of ordinary business skill, and unnecessarily excluded competition from the relevant market.

113. Even if Medtronic's bundles did have a legitimate business purpose or could provide genuine efficiencies or advantages, Medtronic could achieve those same efficiencies or advantages through substantially less restrictive means. For example, Medtronic could grant a carve-out from its bundled commitments and pricing penalties for the product categories, such as laparoscopic anti-fog devices, in which a non-full-line supplier like Plasmatica competes. Thus, the bundling is not reasonably necessary to any legitimate efficiency.

114. The viability of a carve-out is not theoretical. Johnson & Johnson (Ethicon) previously issued a carve-out as to a trocar product so that it could be purchased independent of its bundle from non-full-line suppliers. As a result, non-full-line rival share grew significantly. That real-world example confirms both that the bundle forecloses competition and that a carve-out would help restore competition.

115. Medtronic itself recognized that a carve-out fueled a previously excluded rival's growth in the trocar market. A now-public Medtronic document observed that the Ethicon "'carve out' language that protect[ed] non-full-line suppliers" "fueled" the "growth" of a previously excluded rival in the trocar market. Medtronic's document charted the impact on the trocar market, including a market-wide decrease in average sales price and the resulting annual impact of hundreds of millions of dollars of savings to customers. Medtronic's document observed that the previously excluded rival became the market leader after the carve-out. Medtronic thus vowed not to allow that to happen in a separate market for advanced bipolar devices.

116. Medtronic's conduct, individually and collectively, works together to harm and foreclose competition in the relevant market in an unnecessarily restrictive way. By excluding a lower-priced, at least equally efficient rival, Medtronic's conduct obstructs the achievement of competition's basic goals: lower prices, better products, more choice, and more efficient

production methods. As detailed below, Medtronic's conduct preserves supracompetitive prices, blocks adoption of Plasmatica's better-performing PLASMAShield product, and dulls the incentive to innovate and compete. Medtronic continues to engage in this scheme, which continues to harm Plasmatica and consumers. The conduct forms an overall scheme designed to maintain or enhance Medtronic's monopoly power in the relevant market or, in the alternative, creates a dangerous probability that Medtronic will acquire such monopoly power.

## F. Medtronic Is Harming Competition and Consumers

117. Medtronic's conduct is harming competition and consumers. Medtronic's conduct has substantially foreclosed competition. It has also resulted in supracompetitive pricing, fewer choices, and inferior products. And it raises rivals' costs and reduces output. Medtronic's conduct has no procompetitive benefits.

### 1. Substantial Foreclosure

118. Medtronic has an approximately 80% share in the relevant market and enters long-term agreements that have substantially foreclosed competition. Medtronic's conduct prevents customers from having the choice of, and access to, better surgical devices and blocks competitors from reaching hospital purchasers. The unreasonableness of Medtronic's exclusive dealing is confirmed by the combination of the extent of foreclosure in a substantial share of the relevant market, the duration of the exclusionary arrangements, and the height of the barriers to entry and expansion.

119. In operation, Medtronic's agreements foreclose rivals from the hospitals subject to them, and thereby foreclose a substantial share of the relevant market for periods longer than the nominal length of any single agreement, because hospitals are locked into Medtronic's portfolio for years and routinely renew without considering rivals. They operate against the backdrop of

the significant barriers to entry and expansion described above, which leave too little of the market open for a rival like Plasmatica to achieve the scale needed to drive down prices. There is no alternative channel of distribution through which a rival can reach the operating room. By tying up the necessary sales channels, Medtronic's agreements deprive rivals of the distribution and sales volume necessary to achieve efficient scale, raising rivals' costs and preventing or slowing their emergence as effective competitors. The degree of foreclosure is heightened by Medtronic's targeting of the accounts where rivals are gaining traction.

120. Medtronic's agreements substantially foreclose competition in the relevant market. As discussed, Medtronic controls about 80% of the laparoscopic anti-fog devices market. Medtronic's agreements foreclose rivals from more than 60% of the market. The practical foreclosure is greater because the 10% to 20% window in Medtronic's agreements is illusory for the reasons alleged above, and hospitals are unable to even conduct product trials or purchase alternative products because of Medtronic's agreements. The resulting foreclosure is substantial, real, and durable. It ties up the hospital purchasing opportunities a rival needs and persists through the multi-year, staggered, and renewed terms of Medtronic's agreements.

121. Plasmatica has encountered Medtronic's anticompetitive conduct at numerous hospitals nationwide. Hospitals and hospital systems have told Plasmatica that they cannot purchase PLASMAShield at any price, and in many cases cannot even conduct a product trial of it, because of Medtronic's conduct. At least the following hospitals have indicated to Plasmatica that they could not purchase and/or trial PLASMAShield due to their contracts with Medtronic: Ascension (national network of hospitals – over 90 hospitals), Atlantic General/Tidal Health Atlantic (network of 3 hospitals), Bon Secours (network of 47 hospitals), Broward Health (network of 4 hospitals), Catholic Health – St. Joseph's (network of 6 hospitals), Christus Health (network

of more than 60 hospitals), Inova (network of 5 hospitals), MedStar (network of 10 hospitals), Miami Valley Hospital (network of 3 hospitals), Northwell Health (network of 28+ hospitals), NCH – North Naples Hospital, NCH – Baker, New York Presbyterian (network of 10 hospitals), NYU Langone (network of 7 hospitals), St. Agnes, Sisters of Charity (network of 6 hospitals), Tufts (network of 4 hospitals), and Wellstar (network of 11 hospitals).

122. Below are examples of reasons hospitals have provided for not purchasing or even trialing Plasmatica's products.

- Doctor was interested in PLASMAShield but laughed about replacing Clearify, explaining it was a "nonstarter" and there would be "concern about Medtronic raising pricing on other products if they lost this business."
- Hospital "could not even allow [PLASMAShield] to be tried in the operating room because doing so could interfere with [hospital's] bundled purchasing agreements with Medtronic and adversely affect pricing across numerous other products covered under those contracts."
- "Covidien (Medtronic) has bundled the Clearify with other products and it didn't make sense from a pricing perspective."
- Despite doctors' interest in trialing PLASMAShield, hospital was unable to conduct trial because "we are contracted with Medtronic."
- Despite doctor interest due to unsatisfactory Clearify performance, hospital supply chain declined even to conduct "a trial" of PLASMAShield because of Medtronic's contract, which "goes for another 4 years."
- Trial "couldn't move forward because Clearify was already in use and under contract with Medtronic."

- After reviewing "financials" and how to "move forward with" PLASMAShield, the hospital representative stated: "using plasma shield in leu [sic] of our current product (Covidien) will drop us down in their tiered pricing" so "we will not be able to use this product."
- After a successful trial of PLASMAShield and doctors highly recommending its adoption, the hospital rejected PLASMAShield because of the impact on Medtronic's rebates according to senior leaders in the organization.
- Declined trial because "this alternative may effect our preferred pricing agreement with Medtronic using Clearify at this time."
- Doctor was interested and "would love to help" but "can't because of Medtronic contract."
- Hospital was "100% Medtronic so no room to get [PLASMAShield] in."
- Following successful trial, hospital decided purchasing PLASMAShield would "disrupt" the hospital's contract with Medtronic and Medtronic refused to allow even a carve-out, so the hospital would not purchase PLASMAShield.

**2. Medtronic's Supracompetitive Prices**

123. Medtronic's anticompetitive conduct has resulted in supracompetitive prices. With Plasmatica excluded, hospitals face limited competitive alternatives and diminished bargaining leverage, and Medtronic can maintain higher prices and less favorable terms than would be possible in a market where Plasmatica could compete for trials and conversions.

124. Plasmatica's PLASMAShield fulfills the same functions, offers superior features, and provides performance better than Medtronic's laparoscopic anti-fog products. Plasmatica has attempted to overcome Medtronic's conduct by repeatedly reducing its prices, but hospitals simply cannot accept PLASMAShield at any price. In the absence of Medtronic's anticompetitive

conduct, Medtronic would not be able to sustain its pricing because it would lose too much business and would have to lower its prices. Where rivals have been able to compete with respect to other products, Medtronic's prices have fallen, confirming that Medtronic's prices are supracompetitive and are sustained by its exclusionary conduct.

125. Medtronic recognizes the competitive threat that drives this dynamic. As discussed, Medtronic charted the impact of a carve-out on the trocar market, including a market-wide decrease in average sales price and a resulting annual impact of hundreds of millions of dollars of savings to customers. Medtronic thus understands that its conduct allows it to retain a price premium. Indeed, Medtronic's chief executive officer has touted to investors that, even where "a competitor takes up" business due to Medtronic backorders or supply constraints, Medtronic later ends up "right back to where we were based on the contract" because of its "very tight contracts."

### 3. Fewer Choices, Less Innovation, Inferior Products, and Higher Costs

126. Medtronic's conduct has also left hospitals with fewer choices and inferior products. As discussed, hospitals have told Plasmatica that they cannot purchase its products because of Medtronic's conduct and contracts, and the resulting absence of competition has meant inferior product designs and stagnating innovation for customers. Hospitals and surgeons who would otherwise evaluate or purchase PLASMAShield are deterred or prevented from doing so, and patients are denied the benefits of competition among laparoscopic anti-fog technologies. But for Medtronic's anticompetitive acts foreclosing substantial portions of the market, competitors would have more incentive to dedicate resources to capturing a larger share of the market through improved product quality, increased innovation, and lower prices. Entrants and smaller innovators cannot justify continued investment in improved anti-fog technology if incumbent portfolio

suppliers can prevent trials and adoption through bundled penalties rather than product performance, quality, or head-to-head pricing.

127. Medtronic's conduct also raises rivals' costs. Plasmatica and other rivals must overcome not only Medtronic's laparoscopic anti-fog device price, but also the threatened loss of portfolio-wide pricing on other products in Medtronic's bundle. This penalty structure is unrelated to the rival's efficiency in laparoscopic anti-fog devices and prevents competition on the merits. Absent Medtronic's scheme, both potential and actual rivals would have obtained greater sales by offering cheaper and/or superior products, and achieved lower costs by having access to the most efficient sources of inputs or distribution. They also would have acquired a greater share of the market by achieving greater economies of scale, scope, and innovation, which would have further lowered the costs and prices of their products.

128. Medtronic is continuing to suppress innovation in the market for laparoscopic anti-fog devices. Plasmatica's cold-plasma approach represents a fundamental improvement in the category. Medtronic's Clearify relies on a heating-based approach that temporarily reduces lens fogging by warming the laparoscope. As the scope cools during a procedure, the anti-fog effect diminishes, often requiring the scope to be removed from the patient and reheated multiple times to restore performance. In contrast, PLASMAShield employs an innovative, heat-free hydrophilic technology that addresses the root cause of fogging by preventing the fog moisture droplets from creating a visibility obstruction on the lens surface, creating a unified transparent thin layer of water on the lens. By maintaining a consistently clear visual field without repeated reheating, PLASMAShield can significantly reduce or even eliminate the scope removals that interrupt surgery, helping improve procedural efficiency and maintain surgical workflow. By foreclosing trials and adoption of these improvements through bundled penalties, Medtronic withholds the

benefits of Plasmatica's innovation from surgeons and patients. It also discourages continued investment by Plasmatica and other entrants.

#### 4. Medtronic's Conduct Has No Procompetitive Benefit

129. Medtronic's conduct has no procompetitive benefit and, as alleged above, no legitimate business purpose. It does nothing to improve Medtronic's efficiency or its laparoscopic anti-fog products, has not enhanced consumer appeal, has not delivered better products to hospitals or hospital systems, and provides no benefit to consumers.

130. Medtronic's conduct has also not resulted in lower prices. Medtronic inflates its prices above competitive levels and then offers so-called "discounts" that leave them supracompetitive, so its "discounted" prices produce no actual cost savings for consumers. And, even if Medtronic's bundles did provide procompetitive benefits, Medtronic could achieve them through the substantially less restrictive means alleged above, including a carve-out for non-full-line suppliers such as Plasmatica. Thus, Medtronic's bundling and other anticompetitive conduct is not reasonably necessary to any legitimate efficiency.

### G. Antitrust Injury and Standing

#### 1. Antitrust Injury

131. Plasmatica, Ltd. and Rostan Medical, Inc. have each suffered losses as a direct consequence of the anticompetitive aspects of Medtronic's conduct. Medtronic has substantially foreclosed competition through the conduct discussed above, holds a monopoly position in the relevant market, and employs anticompetitive practices that serve only or principally to impede rivals from offering competitive products.

132. Plasmatica, Ltd. develops and manufactures a product Medtronic's scheme is designed to exclude from U.S. hospitals. Its superior technology threatens Medtronic's monopoly.

Plasmatica, Ltd. bears the costs of developing, manufacturing, and supplying the product. It also retains title to each unit until the customer sale. Plasmatica, Ltd. also holds the FDA clearance for PLASMAShield and participates in setting the strategy, pricing, and material terms on which PLASMAShield is offered to U.S. hospitals. Plasmatica, Ltd. further receives a contractually fixed share of every U.S. sale. It therefore participates in the relevant market as a direct target of Medtronic's exclusionary scheme.

133. Plasmatica, Ltd.'s injury is the very injury the antitrust laws are designed to prevent. Medtronic's conduct excludes an at least equally efficient rival, thereby raising prices, reducing output and choice, and suppressing innovation. That same conduct causes Plasmatica, Ltd.'s lost sales. Every sale Medtronic forecloses deprives Plasmatica, Ltd. of the economic return on its product. Plasmatica, Ltd.'s losses therefore do not result from competition on the merits or any procompetitive feature of Medtronic's conduct. They are the direct consequence of Medtronic preventing PLASMAShield from competing on the merits.

134. Medtronic's conduct has thus deprived Plasmatica, Ltd. of the profits and economic opportunities it would have earned from sales of PLASMAShield. Plasmatica, Ltd. has lost sales to hospitals and the proceeds and follow-on business those sales would generate. Medtronic's foreclosure has also denied Plasmatica, Ltd. the economies of scale it would achieve at competitive sales volumes, increasing its per-unit costs. And by preventing surgeons and hospitals from using PLASMAShield, Medtronic has suppressed Plasmatica, Ltd.'s ability to demonstrate its product's superior performance, harming its brand, goodwill, and enterprise value. These losses, including lost investments, lost sales proceeds, lost scale economies, diminished goodwill, and the suppressed return on Plasmatica, Ltd.'s investment in PLASMAShield, are the immediate consequences of Medtronic's foreclosure of the market.

135. Rostan Medical, Inc. commercializes PLASMAShield in the United States. Rostan approaches hospitals, health systems, and GPOs; it conducts demonstrations, evaluations, and clinical trials required for conversion; and it submits proposals through which PLASMAShield competes with Clearify for the same customers and procedures. Rostan also obtains a contractually fixed share of every U.S. sale. It therefore participates in the relevant market in its own right and attempts to compete with Medtronic for hospital business. Medtronic's scheme targets the very trials, proposals, and conversions through which Rostan seeks to compete.

136. Rostan's injury is the very injury the antitrust laws are designed to prevent. The same conduct that harms competition also causes hospitals to reject Rostan's proposals, abandon or refuse its trials, and forgo purchasing PLASMAShield. Rostan's losses do not result from competition on the merits or any procompetitive feature of Medtronic's conduct. They result directly from Medtronic preventing Rostan from competing on the merits.

137. Medtronic's conduct has accordingly deprived Rostan of the profits and business opportunities it would have earned selling PLASMAShield in the United States. Rostan has lost hospital sales and the follow-on business those sales would generate. Rostan has also expended substantial time and resources on demonstrations, trials, and sales efforts that Medtronic's conduct prevented from resulting in sales. By suppressing PLASMAShield's market penetration, Medtronic has prevented Rostan from showcasing a superior, lower-priced product, building its customer base, and strengthening its brand and goodwill. These losses are the direct consequences of Medtronic's foreclosure of the market.

138. Medtronic's conduct therefore directly injures each Plaintiff. Plasmatica, Ltd. and Rostan Medical, Inc. have each suffered antitrust injury proximately caused by the anticompetitive aspects of Medtronic's conduct and reflecting the substantial foreclosure of competition alleged in

this Complaint. Neither Plaintiff seeks duplicative recovery for the same loss. The full extent of each Plaintiff's damages will be established in these proceedings.

**2. Antitrust Standing**

139. Plasmatica, Ltd. and Rostan Medical, Inc. each have antitrust standing. As alleged above, each has suffered antitrust injury. Each is a competitor in the relevant market that is willing and able to compete for, and to supply, the business Medtronic has foreclosed. Each has lost profits on sales of PLASMAShield in the relevant market. As a direct result of Medtronic's anticompetitive practices, Plasmatica, Ltd. and Rostan Medical, Inc. have each suffered direct, substantial, and ongoing losses. The nature of the injury to each of Plasmatica, Ltd. and Rostan Medical, Inc. is precisely the type of injury Congress sought to redress through the antitrust laws. And the losses of each flow directly from the anticompetitive aspects of Medtronic's conduct and not from any superior efficiency, lower cost, or better product on Medtronic's part.

140. Each Plaintiff is also an efficient enforcer of the antitrust laws. The interests of both companies coincide with the public policies underlying the antitrust laws because they seek an injunction that will open the relevant market to competition on the merits, increase quality, increase innovation, lower prices, and deter similar conduct. Each of the factors that courts consider in assessing antitrust standing confirms that each of Plasmatica, Ltd. and Rostan Medical, Inc. is a proper plaintiff to enforce the antitrust laws against Medtronic's conduct.

141. First, there is a direct causal connection between Medtronic's antitrust violations and the harm that each of Plasmatica, Ltd. and Rostan Medical, Inc. has suffered. Medtronic's trial-blocking conduct, exclusionary bundling, and long-term agreements amounting to de facto exclusive dealing are the direct cause of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s lost sales because they prevent sales to the very hospitals that would otherwise evaluate and adopt

PLASMAShield. As alleged above, both Plaintiffs participate directly in the relevant market, both compete against Medtronic through the sale of PLASMAShield, and both lose their own economic interests when Medtronic forecloses those sales. Medtronic's conduct injures both Plaintiffs directly and simultaneously. Neither Plaintiff's injury is derivative, remote, or dependent on injury first suffered by another party. In the alternative, even if viewed as jointly injured, such injury is likewise not dependent on any injury first suffered by another party. No intervening actor, market, or decision separates either company's injury from Medtronic's conduct. Every foreclosed sale of PLASMAShield eliminates each Plaintiff's contractual share of that sale, making that loss a foreseeable and necessary consequence of the same foreclosure Medtronic seeks to accomplish.

142. Second, Plaintiffs' injuries are not remote: Medtronic's conduct targets each Plaintiff specifically and by design. Plaintiffs are potentially disruptive competitors whose superior, breakthrough-technology product threatens Medtronic's dominant position. Medtronic has deliberately directed its exclusionary conduct at each Plaintiff to foreclose them from the relevant market and cause harm. That conduct is aimed at the PLASMAShield product and at the would-be rivals who seek to bring it to hospitals.

143. Third, no other potential plaintiff is better suited to vindicate the harm from Medtronic's scheme. Plaintiffs, as the excluded competitors, are the best-positioned enforcers of the antitrust laws here. Hospitals are Medtronic's direct customers and face penalty pricing and retaliation if they step out of line with Medtronic. They can also pass along overcharges to payors and patients. Thus, they have little incentive to sue and strong reasons not to sue a supplier on which they depend. The aggregate harm to patients is spread across millions of procedures. Patients are thus less likely to detect Medtronic's conduct or bring a complex antitrust suit to challenge it. In contrast, each Plaintiff suffers the direct losses from PLASMAShield's foreclosure

and has the strongest incentive to sue. The Plaintiffs' relief would restore competition for hospitals, surgeons, patients, and payors. Without this case, Medtronic's violations may go unchallenged.

144. Fourth, Plaintiffs' damages are not speculative. They sell an established, FDA-cleared product at known prices, with a known cost structure, to an identifiable universe of hospital customers. The sales lost as a result of Medtronic's foreclosure can be calculated with reasonable certainty. The commercial arrangement between Plasmatica, Ltd. and Rostan Medical, Inc. fixes how the proceeds of each such sale would have been divided between them. Each company's share of the lost proceeds, and each company's other losses, can therefore be determined without speculation.

145. Fifth, the apportionment of damages is not complex and would not risk duplicative recoveries. Plaintiffs do not seek to recover the same losses twice. Because their arrangement fixes the division of proceeds between them, allocating damages between them requires no complex apportionment. The same is true even if Plaintiffs are viewed as having been jointly injured by the foreclosure of PLASMAShield sales. Both companies are before the Court in this single action, which permits any joint injury to be addressed in one proceeding without duplicative recovery, inconsistent judgments, or difficult apportionment. Plaintiffs alone suffer the lost profits from the foreclosed sales of PLASMAShield. No purchaser or other party could assert a claim to those same profits. Any claim a purchaser might assert for overcharges would redress a different injury with different damages.

146. Sixth, each Plaintiff will be able to efficiently and effectively enforce any judgment it obtains. Plaintiffs are both established companies with the resources and incentive to prosecute this case and enforce the relief awarded. Because each Plaintiff's losses are concentrated and

substantial, each has a direct and continuing stake in enforcement that dispersed purchasers, patients, and payors would lack. As active competitors dealing continuously with the very hospitals, health systems, and GPOs that Medtronic's agreements cover, Plaintiffs are also well positioned to detect violations of the Court's decree and seek its enforcement. Enforcing a judgment for Plaintiffs would advance the public interest in competition by removing restraints that result in higher prices, less innovation, and a lack of customer choice.

147. Plasmatica, Ltd. and Rostan Medical, Inc. thus each have antitrust standing to seek damages and to seek injunctive relief against Medtronic's ongoing conduct, and to assert the claims set forth below.

**CAUSES OF ACTION**

**COUNT I: Monopolization — Sherman Act § 2**

**by Plasmatica, Ltd. and Rostan Medical, Inc.**

148. Plasmatica, Ltd. and Rostan Medical, Inc. reallege and incorporate by reference paragraphs 15-147.

149. The relevant market is the market for laparoscopic anti-fog devices in the United States, or in the alternative, a market that also includes simple anti-fog solutions.

150. Medtronic possesses monopoly power in the relevant market. Medtronic holds an approximately 80% share in the market for laparoscopic anti-fog devices or, in the alternative, at least a 75% share in a market that also includes simple anti-fog solutions. Medtronic's power is protected by significant barriers to entry and by the inability of existing competitors to expand their output in the short run.

151. Medtronic has engaged in impermissible exclusionary practices with the design or effect of protecting and enhancing its monopoly position. Medtronic has thereby willfully

acquired, maintained, and enhanced its monopoly power by improper and anticompetitive means rather than through competition on the merits. Each of Medtronic's exclusionary practices, individually and in combination, is designed to and does foreclose competition and protect and enhance Medtronic's monopoly position, and none is justified by any legitimate business purpose that could not be achieved through substantially less restrictive means.

152. Medtronic is not competing on the merits and does not have more efficient production or superior product quality. Instead, Medtronic maintained its dominant share through anticompetitive means. Medtronic's conduct has directly resulted in demonstrable harm to competition, including higher prices, reduced output, fewer choices, inferior products, reduced innovation, and limits on rivals' market penetration compared to a market without Medtronic's conduct. Moreover, Medtronic's conduct creates and enhances Medtronic's monopoly or significant market power.

153. Medtronic's conduct causes and threatens injury to each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s business, property, and competitive position, which will continue unless enjoined. Plasmatica, Ltd. and Rostan Medical, Inc. have each lost and will lose substantial sales and profits in the relevant market that would have occurred but for Medtronic's conduct. Each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s injuries is of the type the antitrust laws are intended to prevent and flows directly from Medtronic's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

154. Medtronic's conduct affects interstate commerce, because laparoscopic anti-fog devices and related products are manufactured, distributed, sold, and shipped across state lines, and Medtronic's contracts affect purchasing, prices, output, and availability of medical devices throughout the United States.

155. Without injunctive relief, Medtronic will continue to monopolize and restrain trade in the relevant market, harming hospitals and excluding rivals to preserve its monopoly position. Medtronic's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT II: Attempted Monopolization — Sherman Act § 2**

**by Plasmatica, Ltd. and Rostan Medical, Inc.**

156. Plasmatica, Ltd. and Rostan Medical, Inc. reallege and incorporate by reference paragraphs 15-147.

157. The relevant market is the market for laparoscopic anti-fog devices in the United States, or in the alternative, a market that also includes simple anti-fog solutions.

158. Medtronic holds an approximately 80% share in the market for laparoscopic anti-fog devices or, in the alternative, at least a 75% share in a market that also includes simple anti-fog solutions. Medtronic's power is protected by significant barriers to entry and by the inability of existing competitors to expand their output in the short run.

159. To the extent Medtronic does not already possess monopoly power in the relevant market, there is a dangerous probability that Medtronic will acquire that power through its predatory and anticompetitive conduct. By foreclosing Plasmatica and the other rivals that would otherwise bring competition to the market, Medtronic's conduct eliminates the sources of competitive discipline on its pricing and share. Medtronic's market share, the barriers to entry and expansion alleged above, and the multi-year commitments in Medtronic's agreements create a dangerous probability that Medtronic will acquire monopoly power if it does not already have it. Medtronic's conduct, including its exclusionary bundling, directions to stop competitive trials, and strategies to hide pricing and impose punitive pricing, shows Medtronic's specific intent to monopolize. Given Medtronic's share, the significant barriers to entry and expansion, and the

inability of existing competitors to expand their output in the short run, there is a dangerous probability that Medtronic will achieve monopoly power unless restrained.

160. By engaging in that conduct, Medtronic has abused and is abusing its market power and has severely impeded competition, thereby entrenching and enlarging its position.

161. Medtronic is not competing on the merits. Its conduct has directly resulted in demonstrable harm to competition, including higher prices, reduced output, fewer choices, inferior products, and limits on rivals' market penetration, and causes and threatens injury to each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s business, property, and competitive position. Each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s injuries flows directly from Medtronic's violation of Section 2 of the Sherman Act.

162. Medtronic's conduct affects interstate commerce, because laparoscopic anti-fog devices and related products are manufactured, distributed, sold, and shipped across state lines, and Medtronic's contracts affect purchasing, prices, output, and availability of medical devices throughout the United States.

163. Without injunctive relief, Medtronic will continue its attempt to monopolize and restrain trade, harming hospitals and excluding rivals to enhance its position. Medtronic's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT III: Unlawful Restraint of Trade — Sherman Act § 1**

**by Plasmatica, Ltd. and Rostan Medical, Inc.**

164. Plasmatica, Ltd. and Rostan Medical, Inc. reallege and incorporate by reference paragraphs 15-147.

165. The relevant market is the market for laparoscopic anti-fog devices in the United States, or in the alternative, a market that also includes simple anti-fog solutions.

166. Medtronic holds an approximately 80% share in the market for laparoscopic anti-fog devices or, in the alternative, at least a 75% share in a market that also includes simple anti-fog solutions. Medtronic's power is protected by significant barriers to entry and by the inability of existing competitors to expand their output in the short run. Medtronic thus has substantial market power in the relevant market, its position is protected by high barriers to entry and expansion, and it imposes supracompetitive prices in the relevant market.

167. As discussed above, Medtronic enters into anticompetitive bundling and exclusionary agreements that in practice require hospitals to purchase all or nearly all of their laparoscopic anti-fog devices from Medtronic for long periods. By using these trade restraints, Medtronic has intended to restrain commerce for its own benefit.

168. Through its agreements and arrangements, Medtronic has unreasonably restrained trade and caused demonstrable harm to competition in the relevant market. Medtronic has substantially foreclosed competition in greater than 60% of the relevant market.

169. Medtronic's practices have cumulatively undermined competition in the relevant market more than they have furthered any legitimate, procompetitive purpose, and any legitimate purpose could have been achieved by less restrictive means. Medtronic's conduct causes and threatens injury to each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s business, property, and competitive position, which will continue unless enjoined. Each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s injuries flows directly from Medtronic's violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

170. The restraint affects interstate commerce, because laparoscopic anti-fog devices and related products are manufactured, distributed, sold, and shipped across state lines, and

Medtronic's contracts affect purchasing, prices, output, and availability of medical devices throughout the United States.

171. Without injunctive relief, Medtronic will continue to restrain trade. Medtronic's conduct constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**COUNT IV: Exclusive Dealing — 15 U.S.C. §§ 1, 14**

**by Plasmatica, Ltd. and Rostan Medical, Inc.**

172. Plasmatica, Ltd. and Rostan Medical, Inc. reallege and incorporate by reference paragraphs 15-147.

173. The relevant market is the market for laparoscopic anti-fog devices in the United States, or in the alternative, a market that also includes simple anti-fog solutions.

174. Medtronic holds an approximately 80% share in the market for laparoscopic anti-fog devices or, in the alternative, at least a 75% share in a market that also includes simple anti-fog solutions. Medtronic's power is protected by significant barriers to entry and by the inability of existing competitors to expand their output in the short run. Medtronic thus has substantial market power in the relevant market, its position is protected by high barriers to entry and expansion, and it imposes supracompetitive prices.

175. As discussed above, Medtronic engages in de facto exclusive dealing and enters into anticompetitive agreements that, in practice, require hospitals to purchase all or nearly all of their laparoscopic anti-fog devices from Medtronic for long periods of time. The practical effect of these agreements is to substantially foreclose rivals from hospital purchases for many years.

176. Through these trade restraints, Medtronic has substantially foreclosed competition in greater than 60% of the relevant market. The substantial foreclosure—together with the other

conduct discussed throughout—limits and excludes both existing competitors such as Plasmatica, Ltd. and Rostan Medical, Inc. and prospective new entrants, reinforces and entrenches Medtronic's market power, and thereby raises prices and reduces output, innovation, quality, and choice for hospitals and the patients they serve. These probable immediate and future effects on competition establish the unreasonable restraint.

177. On balance, Medtronic's practices have cumulatively undermined competition far more than they have furthered any legitimate, procompetitive purpose, and any legitimate purpose could have been achieved by less restrictive means. Medtronic's conduct causes and threatens injury to each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s business, property, and competitive position, which will continue unless enjoined, and each of Plasmatica, Ltd.'s and Rostan Medical, Inc.'s injuries flows directly from Medtronic's conduct.

178. The restraint affects interstate commerce, because laparoscopic anti-fog devices and related products are manufactured, distributed, sold, and shipped across state lines, and Medtronic's contracts affect purchasing, prices, output, and availability of medical devices throughout the United States.

179. Without injunctive relief, Medtronic will continue to engage in exclusive dealing. Medtronic has employed trade practices that constitute unlawful exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Plasmatica, Ltd. and Rostan Medical, Inc. respectfully request that the Court enter judgment in their favor and against Medtronic and grant the following relief:

(a) Adjudging and decreeing that Medtronic's conduct violates Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

(b) Awarding each of Plasmatica, Ltd. and Rostan Medical, Inc. its damages in an amount to be proven at trial, trebled as provided by law;

(c) Awarding prejudgment and post-judgment interest;

(d) Permanently enjoining Medtronic from engaging in anticompetitive conduct and enjoining Medtronic from enforcing or entering into exclusionary agreements;

(e) Enjoining Medtronic from imposing pricing penalties or other adverse terms because a customer conducts an evaluation or trial of rival devices, including Plasmatica's laparoscopic anti-fog devices;

(f) Requiring Medtronic to provide appropriate notice to customers that they may evaluate and purchase Plasmatica's anti-fog devices without losing pricing on unrelated products;

(g) Awarding reasonable attorneys' fees and costs of suit, including as provided by 15 U.S.C. § 15 and 15 U.S.C. § 26; and

(h) Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Plasmatica, Ltd. and Rostan Medical, Inc. demand a trial by jury on all issues so triable.

Dated: September 18, 2026.

Respectfully submitted,

By: /s/ Alaina Fotiu-Wojtowicz
Alaina Fotiu-Wojtowicz, Esq.
Florida Bar No. 84179
Brodsky Fotiu-Wojtowicz, PLLC
44 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 503-5054
Facsimile: (786) 749-7644
alaina@bfwlegal.com
docketing@bfwlegal.com

Stephen W. Larson
California Bar No. 240844
*Pro Hac Vice Motion Pending*
Nefi R. Oliva
California Bar No. 342986
*Pro Hac Vice Motion Pending*
Knobbe, Martens, Olson & Bear, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 721-5301
Stephen.Larson@knobbe.com
Nefi.Oliva@knobbe.com

Adam B. Powell
California Bar No. 272725
*Pro Hac Vice Motion Pending*
Knobbe, Martens, Olson & Bear, LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 707-4000
Adam.Powell@knobbe.com

*Counsel for Plaintiffs*